## Case No. 4,547.

### The EUREKA.

[2 Lowell, 417.] [1]

District Court, D. Massachusetts. July, 1875.

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

F. Goodwin, for libellants.
J. B. Richardson, for ship-owners.
J. C. Dodge, for owners of cargo.
C. W. Storey, for charterers.

LOWELL, District Judge. The principal objection taken to this hypothecation is that the master did not write sufficiently to the owners of the ship, and not at all to the owners of the cargo. Whether this objection is open upon the pleadings, is a serious question; but as the case was carefully argued upon its merits, I will decide them, without prejudice to the libellants' right to take this point in the appellate court, if my judgment could prejudice him in that respect.

The vessel put into Cape Town in distress, and leaking. Some of the damage had been caused by heavy weather, and as much or more by worms. The captain's letters to the managing owner show an intention of concealing from the underwriters the extent of that part of the damage for which they would not be responsible. Whether the owners have either rebuked or repudiated his conduct in this respect, I have no means of knowing, and I certainly shall not assume that they approved it; but, so far as communication goes, his letters to them appear to have been full and frank, unless in one particular, which I shall presently notice; and if communication is required by the law, they seem to have received it. Letters much less explicit were considered sufficient in The Gratitudine, 3 C. Rob. Adm. 240, and The Bonaparte, 8 Moore, P. C. 459.

This point of law is not settled by decisions in this country. In England, it has come to be the law, and is laid down as a general rule, that the master must communicate, if reasonably possible, with the owner of the ship, before hypothecating it; and separately and distinctly with the owners of the cargo, before he includes that in the security to the bondholder; and it would seem that the lender is bound to see that such communication is made. The Oriental, 7 Moore, P. C. 398; The Bonaparte, 8 Moore, P. C. 459; The Hamburg, 2 Moore, P. C. (N. S.) 289; The Onward, L. R. 4 Adm. & Ecc. 38, 57.

So far as the cargo is concerned, a judge whose learning in the foreign law is extensive has expressed the opinion that this doctrine of which, however, he appears to approve as just, is peculiar to the jurisprudence of England. Sir R. Phillimore, in The Karnak, L. R. 2 Adm. & Ecc. 289. In a case which touched only the ship, the cargo not having been hypothecated, it was said by the lord chancellor of England, as late as 1847, that there was no law requiring the owner to be notified. Glascott v. Lang, 2 Phil. Ch. 310. And Dr. Lushington took occasion to say more than once that he had been ignorant of any such law as to either ship or cargo, until instructed by his official superiors. The Olivier, Lush. 490; The Hamburg, 2 Moore, P. C. (N. S.) 304.

No such general rule has been adopted in the United States. By our law a master may hypothecate his vessel for supplies and repairs in any port out of his own state, and in the many cases in which this subject has been discussed not an intimation has been made that he must first consult his owners. This silence is conclusive of the question, because there has been scarcely a case of late years in which such notice might not have been readily given.

In this country, therefore, if notice is necessary, the want of it goes only to the validity of the maritime premium. See 1 Pars. Shipp. & Adm. p. 142. And how far this is to be invalidated will depend upon circumstances; because, as is pointed out by Pardessus, a bottomry bond, notwithstanding the premium, may sometimes be more beneficial for the ship-owner than the ordinary loan for necessaries, which binds not only the ship, but also the owner, though the ship should not reach her home port. 3 Pard. Droit Com. No. 911.

That a bond taken in good faith and for an honest advance, but turning out to be invalid for some technical reason, will not destroy the tacit hypothecation, I hold to be well settled, notwithstanding that Mr. Justice Nelson, in delivering the opinion of the supreme court, reserved his opinion upon it; for, besides several decisions never overruled, it is a just rule adopted by all courts which are governed by equitable principles, and one of wide application, that a good title shall never merge in a bad one, excepting, of course, in cases of fraud (The Hunter [Case No. 6,904]; The William & Emmeline [Id. 17,687]; The Virgin, 8 Pet. [33 U. S.] 550, per Story, J.); and so in the law of France (3 Pard. Droit. Com. No. 911).

I am not acquainted with any decision or dictum in the courts of the United States that requires a direct and separate communication to be made with the owners of the cargo under any circumstances; but there are a few dicta and one decision in respect to the ship-owner. The decision is The Circassian [Case No. 2,724]. I do not say there is no such law, but, so far as the cargo is concerned, I shall reserve my opinion. And as to both I am prepared to say that there is no general rule which throws upon the bondholder the burden of either proving such notice or excusing the want of it. The dicta which I have referred to do not carry us far; but I think it has been generally admitted, or taken for granted, that as maritime interest should not be paid without necessity, therefore, if the master was in a position to ask for money from his owners, whether by mail or telegraph, and to obtain an answer immediately or without any injurious delay, he should write, before promising to pay a large premium. Thus Marshall, C. J., says the bond may be given "wherever the owner himself or his known or authorized agent could not be consulted, without endangering or retarding the voyage." Selden v. Hendrickson [Id. 12,639]. This saying resembles very closely, and perhaps not accidentally, the provision in the laws of Oleron, concerning the right and duty of the master to sell a part of his cargo in order to raise money for the necessities of the ship. "Certain merchants, or one," says this venerable code, "freighteth a ship and setteth it in way. The said ship entereth into a haven, and is there so long that money faileth them. The master ought for to send in haste into his country for money, but he ought not to lose his time, for if he do he is bound to redress all the damages of the merchants. But he may take of the wine and of the merchants' goods, and make sale for his store," &c. Laws of Oleron, art. 23, Black Book of Ad. vol. 1, p. 119. It will be remembered that it was upon the power of the master to sell part of the goods that Lord Stowell chiefly relied, in admitting his power to hypothecate the whole, in his famous judgment in The Gratitudine, 3 C. Rob. Adm. 240.

The first decision in England and the only one in the United States were made in cases where the master was in direct telegraphic communication with the ship-owner, and all that he need do, when the demand for a bottomry security was made upon him, was to ask instructions, which he could receive in a few hours. The Oriental, 7 Moore, P. C. 398; The Circassian [supra]. But it cannot be admitted that when the defendant has proved the time which the mail will take and the time the ship was detained, and that the latter exceeds the former, this burden is sustained, and the bondholder is put upon his defense. I do not understand that the English cases, rightly read, sustain any such notion; but some of the sayings of learned judges may seem to look in that direction.

In this case no questions were asked, even in cross-examination, to develop the essential facts, upon which alone this point could be decided: such as, whether the delay was expected to be so long as it was; when the necessity of a bond was first apparent; under what dangers of loss a still greater delay for instructions would have brought the ad-

venture; what was the supposed value of the vessel when repaired. And only at the trial, from witnesses who happened to be accessible, was any testimony given about the course of the mails, and the facilities at Cape Town for transshipment. Not a word is said about this matter in the pleadings; not a word is asked of the bondholder about it when his deposition is taken; and, in short, the elements for a just determination of the question have not been brought out. It appears to have been an after-thought.

Even in England the admiralty court appears to insist that a want of due communication should be specially pleaded; though I am not sure whether the privy council agree in this. See The Olivier, Lush. 490; Glascott v. Lang, 2 Phil. ch. 310; The Bonaparte, 8 Moore, P. C. 460. Taking the evidence exactly as it stands before me, and taking the captain's letters to be honest, which they seem to be, and laying aside all consideration of the burden of proof, the case does not appear to be one in which the master could well have waited for funds after he found out his need of more money than the sales of damaged cargo would supply. The Staffordshire, 25 Law T. (N. S.) 137; 8 Moore, P. C. (N. S.) 443; L. R. 4 P. C. 194; The Gratitudine, 3 C. Rob. Adm. 240. In the latter case, which is the great fountain of learning and suggestion on this subject, will be found many remarks applicable to the case at bar. See pages 262 and 274. The learned judge sustained the bond upon the cargo under circumstances which strike me as far less favorable to the holder in this matter of communication than is that now before me. Here the mail took three months to go and return, and there is much reason to say that the master had no expectation of staying so long at Cape Town. In his letters he regrets, in terms which have every appearance of sincerity, that he is so distant as to be practically beyond the advice and assistance of his owners.

There is one piece of evidence, indeed, that might lead one to suspect that the master had held back information. The libellants, who transacted all the business with the master, say that already in May there was an arrangement for a bottomry bond. If this were so, I think the master ought to have informed the managing owner. But the master denies the fact. There may have been a misunderstanding between the parties; or it may be that the agreement was conditional on a state of circumstances which the master thought would never happen, that is, that the repairs would exceed the value of the damaged sugar to be sold, and so the conversation escaped his recollection. I do not feel justified in finding fraud, which there must have been, if so important an agreement was purposely kept back.

Most of the contested cases in England have been cases about cargo, because the master almost always does inform his owners

of all that happens to him, and such notice is all that can usually be required, and is equivalent in most cases to a demand for money; and an absence of such usual communication would be strong evidence of fraud. But as applied to the freighters, the doctrine is admitted to be peculiar to England, and believed by many learned judges there to be novel. I reserve my judgment upon it, except that, if it is understood that any rigid and arbitrary test of an agent's good faith and prudent action is likely to be adopted in the maritime law, I do not share that opinion.

The pleadings and evidence which I have already referred to make it unnecessary to dwell more upon the law. If the English cases were of authority here, they would not require this bond to be set aside.

Coming, then, to the items of the account, several objections are made:

1. To the premium for insuring the risk being included; and this is abandoned by the libellants.

2. To the amount of the charge for maritime interest. This charge is called fifteen per cent., but is in fact a little above twenty per cent., because the sum or principal upon which it is charged includes a charge for the bill of exchange, which was not accepted. It seems that the libellants, acting for the master, whose agents they were, advertised for money on bottomry; but they published the advertisement in the morning, and gave only until the same day at one o'clock in the afternoon for proposals. They appear to have acted on one of those supposed conventional rules that I have referred to, and to have thought that a publication was necessary, but might be merely formal. We must take them upon their own ground, and assume the notice to have been necessary or desirable; and from its inadequacy we ought to presume that a lower bid was feared, if time had been given to make one. Indeed, it is by no means clear that a lower offer was not made; but the evidence is somewhat obscure, and I do not rely upon it. I shall allow twelve per cent. upon the advances actually made, which will amount to nearly fifteen, because the advances were partly by a loan of credit, entirely justifiable and proper, but which gave the libellants a further premium than that appearing on the face of the bond.

3. The captain received in money from the libellants £88, for discounts, which the libellants testify would have been allowed him for his own use by the several tradesmen, if he had settled his bills himself. This practice of agents procuring discounts on the bills of their principals is a most immoral one, but, unfortunately, very extensive and very persistent. The courts have discouraged it in vain. The master, however, swears that he has accounted for the money to his owners. If this is so, there is no reason, perhaps, in this particular case, why

they should retain it, though they certainly ought not to pay interest and premium upon it. I understood the managing owner to say he had received only part of it. He may prove by affidavit how much he has received in account, and for that he should be charged without interest.

4. £630 paid to the master. I think I ought to order a further examination of this item, both upon the law and the facts, if the claimants desire it. It was decided in The Royal Stuart, 2 Spinks, 258, cited at the argument, that an agent who takes a bond is bound to see to the application of the money borrowed, though an ordinary lender may accept the captain's assurance that it is wanted for the legitimate uses of the ship. I should wish further light upon the law, and, if it is as ruled in the case cited, as to the facts of this expenditure.

5. In marshalling the funds, it is claimed by the charterer that he should be repaid the sum of £271 3s. 9d., advanced by him at Java, on account of the freight. This is a valid demand by the law of England, and has been adopted in New York by the district and circuit courts. See The John, 3 W. Rob. Adm. 170; The Catherine, Swab. 263; The Salacia, Lush. 578; The Karnak, 6 Moore, P. C. (N. S.) 136; 5 Moore, P. C. (N. S.) 545; The Anastasia [Case No. 347].

I ought to follow these precedents, unless fully satisfied that they are wrong, which I am not, by any means. This claim is therefore allowed.

Bond pronounced for, excepting as above stated. Further hearing upon the £630, if asked for by claimants within five days; otherwise, decree to be made up in conformity with this opinion.